UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Melissa Day Proulx**

   **v.**                                               Case No. 11-cv-496-PB
                                                      Opinion No. 2012 DNH 180
**Michael J. Astrue, Commissioner**
**Social Security Administration**

### MEMORANDUM AND ORDER

Melissa Day Proulx seeks judicial review of a ruling by the Commissioner of the Social Security Administration denying her application for disability insurance benefits.  Proulx contends that the Administrative Law Judge ("ALJ") who initially denied her claim failed to properly evaluate the expert medical evidence.  Proulx urges this court to either reverse the Commissioner's ruling or remand the case for further hearing.  For the reasons set forth below, I deny Proulx's request.

### I.   BACKGROUND[1]

Proulx was 33 years old when she applied for disability insurance benefits.  She obtained her high school diploma in

---

[1] The background information is taken from the parties' Joint Statement of Material Facts (Doc. No. 9).  See L.R. 9.1(b). Citations to the Administrative Transcript are indicated by "Tr."

1993 and completed a licensed nursing assistant's course in 1995. Her work experience includes jobs as a retail cashier and a licensed nursing assistant. Proulx alleged a disability onset date of October 15, 1999 in her original application for benefits, but she later amended the date to December 11, 2002. She claimed disability due to ankylosing spondylitis,[2] injuries from a car accident in 1998, and memory issues.

On December 24, 2009, the Social Security Administration denied Proulx's claim. She requested a hearing, and after appearing and testifying on March 3, 2011, the ALJ issued a decision denying her request for benefits. This decision became final on August 30, 2011 when the Appeals Council declined to review it.

**A.    Medical History**

    1.    Medical Conditions and Treatment Summary

On August 31, 2001, Proulx began receiving treatment from Dr. Margaret Tilton, a physiatrist, for chronic neck, shoulder, arm, and hand pain. Proulx explained that her symptoms were sporadic and began after a car accident on July 23, 1998. Dr. Tilton's exam revealed soft tissue trigger points and reduced range of cervical motion. Dr. Tilton diagnosed Proulx with

---

[2] Ankylosing spondylitis is arthritis of the spine. Stedman's Medical Dictionary 1456 (25th ed. 1990) [hereinafter Stedman's].

chronic cervical and thoracic myofascial pain superimposed on cervical and thoracic sprain/strain.

Dr. Tilton recommended a series of trigger point injections which Proulx began receiving on September 6, 2001. At her second treatment on October 4, 2001, Proulx reported that the injections provided significant, but temporary, relief. Proulx received trigger point injections every few weeks until April 23, 2002, at which point treatment was suspended because Proulx was due to give birth. She gave birth via Caesarean section on April 26, 2002. The hospital released her three days later.

On August 23, 2002, Proulx visited Dr. Tilton for the first time after giving birth. Proulx reported that her pain management had improved since delivery.[3] Dr. Tilton examined her and reported that she looked "quite good," but noted trigger points on her trapezius and left scapulae. Accordingly, Dr. Tilton ordered another series of trigger point injections.

Dr. Tilton continued to administer trigger point injections to Proulx every few weeks from August 2002 through June 2003 and also in November and December 2003. In her clinical notes from several visits with Proulx, Dr. Tilton reported that Proulx was exercising, including pushing her children outside for a walk,

---

[3] Proulx had begun to use a transcutaneous electrical nerve stimulation ("TENS") unit daily after her son was born.

and participating in water therapy, swim, and yoga.  Tr. 531, 559, 569.

On December 11, 2002, Dr. Tilton drafted a "Permanent Medical Impairment Report," which summarized Proulx's treatment and explained how the relatively low impact collision and resulting soft tissue injury of July 23, 1998 precipitated her symptoms.  Dr. Tilton concluded that Proulx could not perform her past relevant work as a certified nurse's assistant, but "has a capacity for full-time sedentary work, or work in the light category, that would allow her to change position frequently, and not involve any sustained or repetitive cervical motion, or lifting."

On February 12, 2003, Proulx began treatment with Dr. Bruce Samuels, a rheumatologist, for chronic myofascial pain syndrome.  Dr. Samuels observed tenderness in her neck, shoulders, deltoids, trapezius, elbows, and lower back.  He opined in his treatment notes that Proulx appeared to have fibromyalgia, or at least a chronic myofascial pain syndrome.  Dr. Samuels noted that Proulx was receiving trigger point injections and, more recently, Botox for her stiff neck and discomfort.  Dr. Samuels commented that a low dose of steroids could help to alleviate her pain.  Thus, on May 15, 2003, Proulx started taking

Prednisone.  In June,[4] Dr. Samuels noted that Prednisone helped to eliminate pain in Proulx's lower extremities, but not her upper extremities and neck.

On June 30, 2003, Proulx reported severe pain and cried during her exam with Dr. Samuels.  Proulx explained that she was now taking four Percocet pills each day for pain.  Dr. Samuels noted that he was "at a loss of what to do" or where to send Proulx for treatment.  He provided Proulx with OxyContin and ordered a bone scan.  On July 21, 2003, the bone densitometry report indicated normal bone mineral density.

On August 5, 2003, Proulx was feeling better during her exam with Dr. Samuels, but her complaints remained the same. Tr. 596.  Dr. Samuels noted that Proulx had a cervical epidural steroid injection, with minimal relief, but was going back for a second injection.

On August 27, 2003, a cervical MRI revealed mid-cervical spondylotic change with mild spinal stenosis at C3-4 and C4-5 as a result of disc-osteophyte complex.[5]  A thoracic MRI on the same date was unremarkable.

---

[4] The date in the record is unclear.  Tr. 597.

[5] Spondylitic refers to inflammation of one or more of the vertebrae.  Stedman's at 1456.  Spinal stenosis is the narrowing of the spinal column.  Id. at 1473.  An osteophyte is a bony outgrowth.  Id. at 1110.

Proulx continued to receive treatment from Dr. Samuels between 2003 and 2011.  On February 15, 2011, Dr. Samuels assessed Proulx's residual functional capacity and stated that she was unable to work.  In an addendum to the February 15th report, Dr. Samuels stated that the limitations he noted in the assessment were present in 2003 and have essentially been constant since then.  Tr. 669.

In his February 15, 2011 report, Dr. Samuels stated that Proulx frequently suffered from pain, was incapable of performing even low stress jobs due to her pain, and could not walk any city blocks without rest or severe pain.  Further, he stated that Proulx could sit for twenty minutes and stand for ten minutes at a time and could only sit or stand and walk for less than two hours in an eight-hour workday.  He added that Proulx could never lift or carry even less than ten pounds and suffered from significant limitations regarding repetitive reaching, handling, and fingering.  Also, he stated that Proulx could not stoop or crouch, would have "bad days and not so bad days," and would always have to miss some work days due to her impairments.  Finally, Dr. Samuels opined that Proulx was sensitive to heat and humidity and needed to avoid extreme cold temperatures, dust, fumes, and gas.

### 2. Agency Examination

On December 21, 2009, consulting physician, Dr. Louis Rosenthal reviewed Proulx's treatment records and completed a residual functional capacity assessment.  Dr. Rosenthal opined that Proulx could perform light work with occasional postural and exertional limitations.

### B. Administrative Hearing

#### 1. Proulx's Testimony

At the March 3, 2011 administrative hearing Proulx testified that she had suffered pain since her car accident in July 1998 and was unable to care for her small children without outside assistance.  Proulx testified that during the relevant period she had problems with self-care and activities of daily living and required help from her husband.  Proulx said it was difficult to drive because she had trouble looking over her shoulder.  It was painful to breastfeed her children or stand up to prepare meals.  She explained that her friends, family members, and some of her husband's employees often helped care for the children when her husband was not home.  She had to take medication to fall asleep and she was unable to sleep through the night.

#### 2. Proulx's Husband's Testimony

Proulx's husband testified that she received two to five

days of relief after receiving trigger point injections. He testified that Proulx was unable to care for her children and family and some of his employees have come to the home to help. He noted that he took care of daily household activities, including cleaning, cooking, and laundry.

    3.  <u>Vocational Expert's Testimony</u>

A vocational expert ("VE") testified that Proulx had worked as a nurse's assistant and as a salesperson. The VE testified that Proulx could not perform her past relevant work because those positions exceed the light exertional level.

The ALJ asked the VE to consider a hypothetical individual with the same vocational factors as the claimant and assume the person has the ability to perform light exertional work and the opportunity to alternate positions every thirty minutes. The ALJ asked the VE to assume that this hypothetical person must occasionally climb stairs, stoop, crouch, kneel and crawl, but is able to avoid climbing ladders, ropes, and scaffolds. The VE testified that such a hypothetical individual could perform unskilled occupations such as a small products assembler, electronics worker, or an escort.

The ALJ also asked the VE to consider an individual with the same vocational factors as the claimant, but instead assume the ability to perform sedentary exertional work. The VE

testified that such a hypothetical individual could perform unskilled occupations such as addresser, loader, or surveillance system monitor.

C.  **Administrative Law Judge's Decision**

The ALJ issued his decision on March 21, 2011, finding that Proulx was not disabled within the meaning of the Social Security Act from December 11, 2002 through December 31, 2003, her date last insured, because she retained the residual functional capacity ("RFC") to perform light work so long as she could alternate positions every thirty minutes and stand from a seated position for a few minutes and stretch.  Tr. 17.  The ALJ determined that jobs exist in significant numbers in the national economy that Proulx could perform.  Id. at 20.

The ALJ's decision became the final decision of the Commissioner on August 30, 2011, when the Decision Review Board failed to complete a timely review.

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and

9

found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence. Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770. Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Irlanda Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The applicant bears the burden, through the

first four steps, of proving that her impairments preclude her from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner determines whether work that the claimant can do, despite her impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.   ANALYSIS

Proulx challenges the ALJ'S decision to deny her disability claim by arguing that he erroneously gave greater weight to the opinions of Drs. Tilton and Rosenthal than he gave to the conflicting opinion of Dr. Samuels.

### A.   Evaluating Conflicting Medical Opinions

The court reviews an ALJ's factual findings under the deferential "substantial evidence" standard and must uphold the ALJ's determinations if substantial evidence in the record supports them.  Ward, 211 F.3d at 655.  When determining a claimant's eligibility for disability benefits, an ALJ must consider all medical opinions in the case record.  20 C.F.R. § 404.1527(b).  To the extent that the record includes evidentiary conflicts, the agency, not the court, must resolve them.  Irlanda Ortiz, 955 F.2d at 769.

Generally, if there is a treating physician, the ALJ must give his or her opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." See 20 C.F.R. § 404.1527(d)(2); Leahy v. Raytheon Co., 315 F.3d 11, 20 (1st Cir. 2002). If there are two treating physicians who reach contrary conclusions, however, the ALJ cannot give controlling weight to both opinions and must therefore weigh the conflicting evidence. See Shaw v. Sec'y of Health & Human Services, 25 F.3d 1037 (Table), 1994 WL 251000, at *3 (1st Cir. June 9, 1994) (per curiam); Irlanda Ortiz, 955 F.2d at 769.

In resolving conflicts in the medical evidence, the ALJ must articulate "good reasons" for the weight given to each treating source's opinion. See 20 C.F.R. § 404.1527(c)(2). The ALJ considers several factors when weighing conflicting medical opinions including: the length of the treatment relationship and frequency of examination; the nature and extent of the relationship; the extent to which the evidence, and the physician's explanation of that evidence, supports the opinion; the consistency of the opinion in the context of the record as a whole; whether the treating physician is a specialist in the field; and any other factors that tend to support or contradict

the opinion.  Id.; § 404.1527(c)(2)-(6).  The ALJ's order "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and reasons for that weight."  Young v. Astrue, Civil No. 10-CV-417-JL, 2011 WL 4340896, at *9 (D.N.H. Sept. 15, 2011) (quoting SSR 96-2P, 1996 WL 374188 (July 2, 1996)).

### B. ALJ's Treatment of Opinion Evidence

Reading Proulx's argument through the lens of the controlling legal standard, his principal claim is that reversal or remand is required because the ALJ lacked "good reasons" for the way in which he resolved conflicts in the opinion evidence.  I disagree.[6]

The ALJ articulated good reasons to discount Dr. Samuels's opinion.  An ALJ may discount a treating source opinion if it

---

[6] Proulx alludes to two additional arguments that do not require extensive discussion.  To the extent that Proulx argues that the ALJ was required to give controlling weight to Dr. Samuels' opinion because he was a treating source, his argument fails because his opinion was in conflict with the opinion of Dr. Tilton, who was also a treating source.  See Shaw, 25 F.3d 1037 (Table), 1994 WL 251000, at *3.  As I have explained, an ALJ cannot simply defer to the opinion of one treating source when it is in conflict with the opinion of another treating source.  Proulx's alternative argument, that the ALJ was required to adopt Dr. Samuels' opinion because he is a specialist, is also a nonstarter because a treating physician's specialty is only one of many factors that the ALJ considers when weighing a medical opinion.  20 C.F.R. § 404.1527(d)(1)-(6).

conflicts with "the claimant's documented complaints," evidence of his activity level, and other medical evidence in the record or if the opinion is conclusory.  See 20 C.F.R. §§ 404.1527(d); Young, 2011 WL 4340896, at *8.  The ALJ discounted Dr. Samuels's opinion because Dr. Samuels's treatment notes prior to December 31, 2003 do not support his conclusions about Proulx's level of functional limitation and his opinion is inconsistent with other evidence in the record, including the findings of Drs. Tilton and Rosenthal.  See Shaw, 25 F.3d 1037 (Table), 1994 WL 251000, at *3; Webster v. Astrue, 628 F. Supp. 2d 1073, 1087 (D. Neb. 2009); Tr. 14-21.

   Dr. Samuels found that Proulx was incapable of even "low stress" jobs because of the chronic pain she was experiencing.  Tr. 665.  To support his conclusion, Dr. Samuels refers to a note from February 2, 2011, but most of the clinical findings and diagnostic history discussed in the note occurred after December 31, 2003.  Id. at 684-88.  In the RFC questionnaire, Dr. Samuels indicated that he first saw Proulx in 2001 and listed her diagnosis as ankylosis spondylitis and chronic pain.[7]  He noted observing symptoms of fatigue, pain, and tenderness,

---

[7] Dr. Samuels filled out a "new patient" report for Proulx on February 12, 2003.  Tr. 599-600.

14

but never mentioned a diagnosis of fibromyalgia in the RFC questionnaire.  See id. at 664-68.

Furthermore, Dr. Samuels' treatment notes from 2003 do not document any observed functional limitations that would support the level of disability he asserts in the questionnaire.  See id. at 596-600.  On February 12, 2003, Dr. Samuels noted that Proulx had a full range of motion, but tenderness at trigger points.  Id. at 600.  On June 30, 2003, Dr. Samuels stated that he had no explanation for her pain.  Id. at 597.  The ALJ reasonably found that Dr. Samuels's conclusions about Proulx's RFC were not supported by Dr. Samuels's treatment notes.

As the ALJ notes, there is no evidence in the medical record of Proulx's inability to ambulate or perform fine and gross movements effectively.  Id. at 17.  In fact, there is evidence that Proulx was able to exercise and volunteer part-time in a pet grooming business.  Dr. Tilton noted that her motor strength is "5/5."  Id. at 582.  While treatment notes often indicate that Proulx often complained of pain, on several occasions Dr. Tilton notes that Proulx was feeling better and even described herself as "not too bad" and "doing pretty well." Id. at 513, 514, 518.  Dr. Tilton's clinical notes indicate that Proulx was exercising: pushing her kids outside for a walk, engaging in water therapy twice a week, swimming, and yoga.  Id.

at 531, 559, 569.  Even Dr. Samuels's notes state that Proulx was able to exercise occasionally.  Id. at 685.  In 2002, Proulx was volunteering at her mother's pet grooming business.  Id. at 539.  This record evidence runs counter to Dr. Samuels's assessment of Proulx's residual functional capacity.

     The ALJ instead credits Drs. Tilton and Rosenthal's findings.  The record includes substantial evidence to support the ALJ's decision to afford great weight to the opinions of Drs. Rosenthal and Tilton and discount Dr. Samuels' opinion.  Both Drs. Rosenthal and Tilton opined that Proulx retained the RFC to perform a range of work at the light exertional level and supported their opinions with references to the record and Proulx's complaints.  Id. at 19-20.

     Dr. Tilton is a physiatrist, or a specialist in physical medicine.  See White v. Barnhart, 415 F.3d 654, 660 (7th Cir. 2005) ("physiatrists are experts in diagnosing and treating acute and chronic pain and musculoskeletal disorders"); Stedman's at 1197.  Dr. Tilton treated Proulx regularly for myofascial pain and fibromyalgia with medication management and regular trigger point injections since August 31, 2001.  Dr. Tilton's opinion was offered prior to the date last insured and is consistent with the evidence of record.  Tr. 19.  On December 11, 2002, Dr. Tilton assessed Proulx's RFC and noted that Proulx

suffered from significant pain despite treatment, but that she nonetheless retained the functional capacity for "full-time sedentary work, or work in the light category, that would allow her to change position frequently, and not involve any sustained or repetitive cervical motion, or lifting." Id. at 540.

Proulx asserts that Dr. Tilton was only opining about her functional limitations caused by a car crash, and did not intend to provide a full evaluation of all of Proulx's limitations. There is no indication in the record, however, that Dr. Tilton intended to ignore Proulx's underlying and preexisting conditions when assessing Proulx's work capacity.

Next, Proulx challenges the weight the ALJ afforded Dr. Rosenthal's opinion. She asserts that the ALJ failed to consider (1) that Dr. Rosenthal's opinion is based on objective clinical evidence that is not germane to an evaluation of her primary disabling condition of fibromyalgia; and (2) Dr. Rosenthal is not a specialist in rheumatology. As discussed above, a physician's specialty is only one of many factors the ALJ must consider. 20 C.F.R. § 404.1527(d)(1)-(6). Drs. Rosenthal, Tilton, and the ALJ accept Dr. Samuels' diagnosis of fibromyalgia, credit Proulx's complaints, and acknowledge the existence of trigger points. The ALJ did not accept Dr. Samuels assessment of Proulx's degree of functional limitation; he found

17

Dr. Tilton's and Dr. Rosenthal's opinions more credible.  Dr. Rosenthal's opinion cites and is consistent with the opinion of Dr. Tilton, a treating physician, and the record evidence.

## IV.     CONCLUSION

For the reasons set forth above, Proulx's Motion for Order Reversing Decision of the Commissioner (Doc. No. 7) is denied and defendant's Motion for Order Affirming the Decision of the Commissioner (Doc. No. 8) is granted.  The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

>                          /s/Paul Barbadoro
>                          Paul Barbadoro
>                          United States District Judge

October 11, 2012

cc:   Gretchen Leah Witt, AUSA
      Christopher G. Roundy, Esq.